166 N.J. Super. 62 (1979)
398 A.2d 1328
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ELIJAH BLANTON, SR., DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN BLANTON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1978.
Decided February 13, 1979.
*65 Before Judges CONFORD, PRESSLER and KING.
Mr. Theodore D. Parsons, Jr. argued the cause for appellant Elijah Blanton, Sr. (Messrs. Labrecque, Parsons & Bassler, attorneys).
Mr. Michael D. Schottland argued the cause for appellant John Blanton (Messrs. Chamlin, Schottland, Rosen & Cavanaugh, attorneys).
Mr. Alan Dexter Bowman, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. John J. Degnan, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by CONFORD, P.J.A.D., Retired (temporarily assigned).
These are consolidated appeals by defendant Elijah Blanton, Sr. ("Elijah") and his son, John Blanton ("John"). Elijah was convicted of assault and battery upon a police officer and John of atrocious assault and battery and resisting arrest. The events giving rise to the charges resulting in these convictions occurred in the course of a disturbance on *66 May 28, 1976 at a playground near a low-income housing project in Long Branch.
The police were originally dispatched to the playground after Elijah's wife called to report an argument between another of her sons and a third person she thought to be in possession of a gun. No gun was found. However, Elijah was carrying on in a loud manner, yelling at and chasing children and arguing with the purported possessor of the gun. There was other testimony that Elijah was simply trying to restore peace to the area. The police soon withdrew from the scene.
Within a short time the police returned to the scene on the order of a superior officer to arrest Elijah if he was found to be causing trouble. The return of the police developed into a melee either witnessed or participated in by a large number of people, mostly juveniles. According to the State's evidence, Officers Wettermark and Brown accosted Elijah and informed him he was under arrest. He pulled away from them, and sticks and other objects were thrown at the officers, Officer Wettermark being struck by some of them. Officer Brown embraced Elijah in a full nelson and in return was bitten by Elijah on his arm. This action was the basis of the charge against Elijah of assault and battery against a police officer.
The charges against John arose out of the attempt of Officer DeFillipo to go to the aid of the officers seeking to arrest Elijah. DeFillipo testified that as he approached the officers and Elijah he noticed an individual wearing an orange tee shirt to his right at a distance of between six and ten feet and immediately thereafter sustained a blow to the top of his head. The man in the orange shirt was John. DeFillipo at once turned around and confronted John, the latter looking directly at him, about three feet away. John had a stick or pipe in his hand of a cylindrical shape and about 2 1/2 feet long. There were no other people in the immediate area. John turned and ran toward his apartment with DeFillipo and Officer Richards in pursuit, the former yelling, "I want *67 him. He hit me." John ran into one door and out another, whereupon he was tackled by one of the officers. There was testimony that John was resisting the officers' efforts to subdue him, "moving his arms about" and attempting to arise from the ground. DeFillipo was bleeding profusely from his scalp. There was other testimony that prior to the assault on Officer DeFillipo John had run into Officer May and had struck him on the arm with a stick and then continued running. However, he was acquitted of a separate charge of assault on Officer May.
John's testimonial version of the events was that he was in the playground practicing for a state championship relay meet to be held the next day and that he was in possession of a relay baton about 12 inches long. When the police came upon the scene they began spraying mace. John saw his father surrounded by police officers and others and asked the officers to let his father alone. One of the officers angrily reached for his gun and John ran away in fear, alleging, before an objection by the State was sustained, that he recalled a former local incident involving the shooting of a juvenile by police. He did not strike anyone but remembered bumping into someone while running away. No one told him he was under arrest at any time. He was assaulted by the police after he emerged from his home.

I  Elijah's Conviction
Elijah complains of the exclusion by the trial judge of Officer May's hospital record concerning the bruise allegedly inflicted upon him by John, offered by Elijah to impair May's credibility in respect of May's testimony concerning the bite Elijah inflicted on Officer Brown. We find no prejudicial error. In the first place, the hospital record was not sufficiently authenticated. See Mahoney v. Minsky, 39 N.J. 208, 218 (1963); Webber v. McCormick, 63 N.J. Super. 409, 416 (App. Div. 1960). Second, the exclusion was harmless as May was confronted with the record and *68 the jury was undoubtedly made aware of the alleged deviance between the record and his testimony. Furthermore, the evidence was sufficiently remote in relation to the facts regarding the assault on Officer Brown as to have warranted its exclusion as a matter of judicial discretion under Evid. R. 22.
Elijah complains of that portion of the prosecutor's summation which informed the jurors that if they found a guilty verdict on all counts, they would "fulfill [their] oath, discharge [their] function as jurors." However, the trial judge subsequently called this incident to the attention of the jurors, implied that the prosecutor's remark may have been "a slip of the tongue," and informed them that their duty was to make their own determination as to the guilt of the defendants and that guilt must be found beyond a reasonable doubt. We agree with defendant that the prosecutor's comment was inappropriate but in the light of the corrective charge we find no prejudicial error.
Elijah argues that his motions for acquittal at the end of the State's case and at the end of the trial should have been granted. We conclude to the contrary. There was ample evidence upon the basis of which the jury, if they chose to credit the testimony offered on behalf of the State, could have found Elijah guilty of assault and battery on Officer Brown beyond a reasonable doubt. State v. Reyes, 50 N.J. 454 (1967).
Elijah was sentenced to nine months in the Monmouth County Correctional Institution. He asserts that this sentence was harsher than was warranted by the circumstances. He specifically complains of references in the presentence report to his addiction to alcohol. However, Elijah's counsel made frequent and strong objection to the references to alcoholism at the time of sentencing, and there is no indication from the sentencing judge's remarks that he gave any consideration to defendant's involvement with alcohol. The judge alluded to the immense crowd in the area at the time *69 and to the explosiveness of the situation, and he mentioned Elijah's past record of assaults and batteries, noting at least two suspended sentences.
We do not find that the references to alcoholism in the presentence report had any effect on the sentence; nor can we find the sentence excessive in the light of all the attendant circumstances.

II  John's Conviction
John contends that the trial judge erred in refusing to grant his motions for acquittal at the end of the State's case and at the end of the entire case. R. 3:18-1, as construed, requires denial of such a motion if, "viewing the State's evidence in its entirety, be that evidence direct or circumstantial, * * * a reasonable jury could find defendant guilty of the charge beyond a reasonable doubt." State v. Reyes, supra (50 N.J. at 458-459).
It is true that there is no direct eyewitness testimony of John having struck DeFillipo. But the circumstantial evidence is substantial. On the basis of the State's proofs no one but John was in DeFillipo's immediate area at the time he felt the blow; he saw John looking at him only three feet away when he quickly turned after being struck, and he saw John holding a stick or pipe in his hand. John's immediate flight thereafter, although sought to be explained by John on a basis consistent with innocence of the assault on DeFillipo, could properly have been considered by the jury as corroborative of the other circumstantial evidence pointing to John as the assaulting agent. This included the fact that, as noted, there was no other person in the immediate area of the two except the officers who were dealing with Elijah at that moment. We are constrained to hold that there was sufficient evidence to justify John's conviction of atrocious assault and battery on DeFillipo.
Defendant argues that the trial judge's instructions to the jury with respect to the charge of resisting arrest were defective *70 because they permitted the jury to conclude that John's flight from the pursuing officers constituted guilt of the offense of resisting arrest. The specific portion of the charge to the jury objected to consisted of the instruction that among the elements of the crime required to be proven by the State was one that defendant "did know that he was under arrest or that the officer was attempting to arrest him and * * * that with that knowledge the defendant John Blanton intentionally sought to avoid or frustrate that arrest."
Our examination of the relevant authorities satisfies us that there was no error in the charge even if the jurors could understand therefrom that flight from a police officer with knowledge by the fugitive that the officer was attempting to arrest him and with the purpose of avoiding or frustrating that arrest, constituted guilt of the common-law offense of resisting arrest.
Resisting arrest is an integral part of the common-law crime of "obstruction of or resistance to a public officer in the performance of his duties." 3 Wharton's Criminal Law and Procedure (1957) § 1283 at 632; The New Jersey Penal Code, vol. II: Commentary (1971), dealing with § 2C:29-2 at 282. By the majority rule the use of actual force is not always necessary to constitute the offense so long as there is some overt act of obstruction. Wharton, op. cit., supra, § 1284 at 633. See, for example, State v. Hollman, 232 S.C. 489, 102 S.E.2d 873, 879 (Sup. Ct. 1958). In many jurisdictions this crime has been codified, and the statutes have generally been construed as permitting a determination of guilt without a finding of the use of force or violence against the officer. See Annotation 44 A.L.R.3d 1018, 1022-1023 (1972). The California cases hold that flight from an officer seeking to arrest is sufficient to constitute evidence of a violation of a statute punishing a person who willfully resists, delays or obstructs a public officer in the discharge of any duty of his office. People v. Wilson, 224 Cal. App.2d 738, 743-744, 37 Cal. Rptr. 42 (D. Ct. App. *71 1964); and see People v. Brooks, 131 Cal. 311, 63 P. 464, 466 (Sup. Ct. 1901).
In formulating § 2C:29-2 of The New Jersey Penal Code (enacted as L. 1978, c. 95, § 2C:29-2, effective September 1, 1979), the New Jersey Criminal Law Revision Commission stated: "We reject the MPC [Model Penal Code] view that mere nonsubmission should not be an offense, believing an affirmative policy of submission to be appropriate as now seems to be our law," citing State v. Mulvihill, 57 N.J. 151 (1970); State v. Washington, 57 N.J. 160 (1970), and State v. Koonce, 89 N.J. Super. 169 (App. Div. 1965). The New Jersey Penal Code, vol. II: Commentary, at 282. The cited section of the Code, both as proposed and adopted, provides for guilt of resisting arrest if the person "purposely prevents a law enforcement officer from effecting a lawful arrest." Such offenses are divided into two categories, one being a crime of the fourth degree and the other a disorderly persons offense. Guilt of the former arises if the person uses or threatens to use physical force or violence against the officer or another, or uses any other means to create a substantial risk of causing physical injury to the officer or another. It thus appears that while mere flight from an intending arresting officer may, depending upon other circumstances, be regarded under the new statute as only a disorderly persons offense, the general offense of resisting arrest may be found to have been committed short of use of force or risk of causing injury so long as the accused has purposely sought to prevent the police officer from effecting an arrest. Our view of the common law, which must be controlling as to the instant offense, is, accordingly, that flight knowingly intended to prevent a police officer from effecting an arrest of the fugitive constitutes guilt of the common-law crime of resisting arrest.
The circumstances given in evidence clearly permitted the jury to find that John knew the police were seeking to arrest him. Officer DeFillipo testified that while pursuing John he yelled out, "I want him. He hit me." John admitted, *72 in effect, that he was seeking to elude the police, although his explanation of his flight was consistent with innocence of the crime of assault. Nevertheless, knowing that a uniformed police officer was seeking to apprehend him, it was his duty to submit and not resist. State v. Koonce, supra.
Defendant's argument concerning the necessity of use of physical force by the arrestee upon the officer is based upon language contained in such opinions as State v. Montague, 101 N.J. Super. 483 (App. Div. 1968), mod. 55 N.J. 387 (1970); State v. Bell, 102 N.J. Super. 70 (App. Div. 1968), certif. den. 52 N.J. 485 (1968), and State v. Owens, 102 N.J. Super. 187 (App. Div. 1968), mod. 54 N.J. 153 (1963). None of these cases, properly analyzed, rejects the concept that the crime of resisting arrest can be committed short of use by the accused of physical force or violence on the arresting officer. The Montague and Bell cases were prosecutions for assault upon an officer, not for resisting arrest. In Owens, while one of the charges involved was resisting arrest, there was plenary evidence of use by the defendant of force and violence on the arresting officers.
We consequently find no error in the trial judge's instructions to the jury in the respect complained of.
John contends there was error in excluding proffered testimony by him that the reason for his flight from the officers was a prior shooting of a juvenile by police. It was the argument of defendant that such evidence would refute the inference that his flight was actuated by a desire to escape apprehension for his alleged assault on DeFillipo. We find that the exclusion of this testimony by the trial judge was within the permissible range of his discretion under Evid. R. 4. The court may exclude evidence, although probative to some degree, if such probative value is substantially outweighed by the risk of necessitating undue consumption of time, of confusion of the issues or of misleading the jury. In objection to the proof here discussed, the State indicated that it would be compelled to cross-examine on and inquire into the prior incident, which apparently had taken *73 place at least a year before the events here in issue. It was clearly possible that a collateral issue of some complexity in relation to the prior incident could emerge, take considerable time and confuse the issues in the present case, as well as prejudice the State by the development of aspersions of police brutality toward juveniles. Cf. State v. Garfole, 76 N.J. 445 (1978). We find no error in this regard.
John also assigns error in the trial judge's refusal to admit the report of Patrolman Frabizio, who testified as to his observations of the encounter between John and the other police officers. John contends that some of the facts testified to by Frabizio are not reflected in the report. The report was admissible. Evid. R. 63(1) (a). However, we find any error in this regard to have been harmless as the patrolman was confronted with the report on cross-examination and the alleged inconsistencies were thoroughly explored before the jury.
Although, as indicated in the foregoing discussion, we find no proper basis for reversal of either of John's convictions, we do conclude that there is merit in John's contention that his sentence to concurrent indeterminate terms to the Youth Correction Center at Yardville was a clearly mistaken exercise of discretion.
It is strongly emphasized in our cases in respect of sentencing that the courts have regard for the "whole man." State v. Green, 62 N.J. 547, 566 (1973). In the present case the reasons for sentence set forth by the trial judge were confined to the consideration that John's offense constituted an assault upon a police officer doing his duty in the prevention of a potentially serious breach of the peace. The judge stated that the imprisonment of this defendant was "necessary to achieve socially justified deterrent purposes, and the punishment of this defendant is an appropriate vehicle to that end" and that "any lesser punishment would deprecate the seriousness of the crime committed." It appears to us, however, that the judge totally ignored the character of the defendant, his age, his background, the *74 current state of his education, his amenability for rehabilitation, and the substantial possibility that extended incarceration, even in a reformatory, would destroy or impair the budding potential for this defendant to develop into a highly useful citizen in our society.
At the time of the offense defendant was 19 years of age and a senior at Long Branch High School. He had no prior criminal or juvenile record whatever. At the time of his sentencing he was a sophomore at Lincoln College in Pennsylvania, where he had been admitted on an athletic scholarship. His ambition is to become a lawyer. The defendant is the product of a disadvantaged black family, all of whose members, except himself and his mother, had apparently been involved in prior brushes with the law. As attested by letters to the trial judge from responsible people in the community and at Lincoln College, this young man was on the verge of breaking the family pattern of chronic failure and of starting on the road to success in life.
The conduct for which the defendant was convicted was unquestionably reprehensible and to be condemned, but sentencing discretion needs to be exercised in the context of all the attendant circumstances and relevant considerations. This defendant had not gone out of his way to assault a police officer. He was involuntarily placed at the center of a violent and emotional confrontation between the police and his father, who was about to be arrested. In the light of his demonstrated character and previous freedom from criminal involvement of any nature whatever, his reaction to the situation can be understood as an emotional reflex to what he perceived as an imminent threat to his father. What he did under the stimulus of these circumstances does not stamp him as of a criminal mentality nor as one apt to repeat such an offense if not deterred by the punishment of incarceration. Our present information is that defendant is now a college junior and that he has acquitted himself satisfactorily in his academic endeavors and with distinction in exracurricular activities. Incarceration of defendant for *75 an uncertain duration at this point of his life would be counterproductive in terms of his future usefulness to society. It might well foreshadow a reversal of the salutary course which he has thus far, with the exception of this single isolated episode, pursued toward worthwhile societal ends. That social cost strongly outweighs the benefit of the deterrent effect of a custodial disposition. The fact alone of his conviction will be a considerable handicap to defendant for the foreseeable future and a deterrent to similar conduct by others. In our considered view, and with all due regard for the normal wide latitude of sentencing discretion at trial level, the sentence imposed upon defendant requires modification in the light of all the attendant circumstances and of the principles expounded in such cases as State v. Leggeadrini, 75 N.J. 150 (1978); State v. Ward, 57 N.J. 75, 82 (1970); State v. Bess, 53 N.J. 10, 19 (1968), and State v. Brennan, 115 N.J. Super. 400 (App. Div. 1971).
The sentence is herewith modified by suspension of the custodial direction, with probation for a period of two years. The terms of the probation are to be fixed in such manner as not to interfere with the completion of defendant's education.
Judgment is affirmed as to Elijah Blanton, Sr. Judgment is modified as to defendant John Blanton, in respect of sentencing, conformably with this opinion.