208 N.J. Super. 595 (1986)
506 A.2d 779
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH N. BURKS, JR., DEFENDANT-APPELLANT.
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
GARY M. KING, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 24, 1986.
Decided March 14, 1986.
*597 Before Judges MORTON I. GREENBERG, LONG and HAVEY.
Thomas S. Smith, Jr., Acting Public Defender, attorney for appellants in each case (Jane Deaterly Plaisted, Designated Counsel, of counsel and on the brief for appellant Joseph N. Burks, Jr., and Catherine T. Hogan, Designated Counsel, of counsel and on the brief for appellant Gary M. King).
*598 W. Cary Edwards, Attorney General, attorney for respondent in each case (James D. Harris, Deputy Attorney General, of counsel and on the brief in each case).
The opinion of the court was delivered by MORTON I. GREENBERG, P.J.A.D.
This matter comes on before this court on separate appeals by defendants Joseph Nathan Burks, Jr. and Gary Marcus King from judgments of conviction in this criminal case. We consolidate their appeals for this opinion. Disposition of the matter requires that we set forth its procedural and factual history at length.
On March 30, 1982 defendants were indicted in Cumberland County for the following offenses. In counts one and two both defendants were charged with aggravated manslaughter, N.J.S.A. 2C:11-4a, and with manslaughter, N.J.S.A. 2C:11-4. In the third count each was charged with unlawful possession of a shotgun without having obtained a purchaser identification card, N.J.S.A. 2C:58-3. In the fourth count Burks and in the fifth count King were separately and respectively charged with possession of a weapon by a person convicted of a crime, N.J.S.A. 2C:39-7. They pleaded not guilty to all charges and a joint jury trial on the first three counts ensued. Prior to the submission of the case to the jury the third count was dismissed on the State's motion. Defendants were each convicted of aggravated manslaughter but no verdict was returned on the manslaughter count as it was moot. Following completion of the jury trial and based on the record made there, the judge, with defendants' consent, tried counts four and five without a jury and found defendants each guilty of violation of N.J.S.A. 2C:39-7.
After defendants unsuccessfully moved for new trials they were sentenced as follows. Burks was sentenced on count one to 15 years imprisonment, with five years to be served before he is eligible for parole, and to a concurrent nine month *599 custodial term on count four. King was sentenced on count one to 18 years imprisonment, with six years to be served before he is eligible for parole, and to a concurrent nine month custodial term on count five. In addition penalties were assessed for the use of the Violent Crimes Compensation Board.
We deal with a preliminary point. King does not mention the conviction for violation of N.J.S.A. 2C:39-7 in either his notice of appeal or his brief and accordingly we consider that he has not appealed from the conviction of violation of that statute.[1] While Burks' notice of appeal indicates he is appealing the conviction for violation of N.J.S.A. 2C:39-7, in his brief he presents no basis for its reversal and thus we consider his appeal for the violation of that section as abandoned and accordingly we dismiss it.
The case involves the fatal shotgun shooting of Elijah Neal by one or both defendants in a rural area in Cumberland County. The property where the events occurred was owned in part by decedent and in part by his aunt. Decedent's property included a main house and, about 100 yeards behind the house down a dirt road, a pigpen, a cornbin and a shed used to store farm equipment and auto parts. Decedent kept pigs in the pigpen which he fed twice a day. According to decedent's widow, Daisy Neal, although decedent had lost a hand he was a good shot and frequently took a gun with him when he fed the pigs so he could shoot rabbits and rats.
Decedent's aunt's property was a plowed field with vegetation 12 to 14 inches high adjacent to decedent's property. While decedent seems not to have farmed his aunt's property, he took care of it and watched it for his aunt. Decedent's aunt allowed people to hunt on her property and neither it nor *600 decedent's property was marked with "no trespassing" or "no hunting" signs. There was a culvert about four feet deep with concrete sides containing a large drainage pipe on or adjacent to decedent's aunt's property, about 100 yards from his property. Apparently decedent rented and farmed a third property near the aunt's field. The area is close to Route 49 and the Ram's Head Inn.
On November 12, 1981 decedent left his house at 4:00 p.m. to feed his pigs. On that day defendants were hunting with shotguns in the field near decedent's property. King, who lived nearby and knew decedent, had previously hunted in some woods in the vicinity. While defendants were hunting King jumped a rabbit at which Burks then shot. They then chased the rabbit into the field behind decedent's house and it ran up toward the shed at the back of decedent's property. Defendants described the shed as being in a state of disrepair. Burks saw some marijuana inside of the shed and signaled to King to come to look at it. Burks said that he wanted to take the marijuana and run but King suggested that if they were to take the marijuana they should pretend they were hunting and looking for the rabbit by the shed. After King fired into the dirt, Burks reached into the shed and grabbed the marijuana which he then gave to King who wrapped it up in his coat. Defendants then ran across decedent's aunt's field and into the culvert.
Defendants began stripping the marijuana from the stalk. King testified he then heard a rifle shot which went over their heads from about 70 to 80 yards away. Defendants turned to face the direction of the gunshot and according to them heard at least one other shot. King testified that he was able to note the change in position of the person firing the shots and he knew "that each shot was getting, you know, closer, a lot closer." King said he heard a voice say "Stand up" or "Come out," and claimed that as he began to stand up out of the ditch the person shooting raised his rifle, whereupon King felt a *601 bullet go over his head. King then admitted that he "throwed [his] gun like over the top of the weeds and pulled the trigger."
Burks also testified that he heard several shots as the two men stripped the marijuana, a statement at odds with his earlier statement to the police that he heard shots as the two men ran across the field. When confronted with this prior statement, Burks testified that it was not true and he was upset when giving it. Burks stated that when King stood up he was almost shot and defendants then both shot at the person with the rifle. Burks testified that he did not want to hurt that person but the latter kept shooting. Unlike King, Burks did not hear any commands from the person.
After the shooting Burks ran toward the woods with King attempting to follow. King, however, slipped and retreated into the drainpipe in the culvert. While the pipe seems to cross under Route 49, King was unable to escape through it as it was barred off. Apparently fearing further shots, King waited for about 45 minutes in the pipe and then left and returned home. When Burks got home he told his brother what had happened following which the two of them went back to the scene of the shooting. Burks' brother saw a body, later identified as decedent, in the field. Burks and his brother then went to talk to King about the situation.
The three men decided to call the police and they did so. Dispatcher William Smith of the Fairfield Township Police Department testified he received a call from an unidentified person at 5:44 p.m. advising that someone across from the Ram's Head Inn was shooting at a couple of hunters. In response, Fairfield Officers James Blair and Danny Houchins checked the area but found nothing.
At 10:19 p.m. on the same day, decedent's wife called the Fairfield police and reported decedent had been missing since about 4:00 p.m. Houchins and Blair responded to the call and went to decedent's residence to look for him, arriving at about 10:30 p.m. Blair saw three sets of footprints which he believed *602 showed two people running and one walking. He followed them and found decedent lying on his right side on top of a 30-30 lever action rifle. Decedent had been shot in the face and chest and was pronounced dead at the scene. An autopsy showed he had over 100 entry wounds from shotgun pellets concentrated in his chest area and extending to his face.
The New Jersey State Police were notified of the situation and State Police Detective Gerald Mull arrived at the scene at approximately 12:35 a.m. on November 13, 1981. According to Mull, decedent was found 29 feet from the culvert with his rifle in a cocked position containing three unfired rounds of a capacity of eight. Mull ordered a preliminary search of the immediate area for spent shells as he believed that if decedent had fired his weapon in the vicinity any spent shell would have been ejected before a live shell could be introduced into the chamber. There was evidence that an ejected shell would travel no more than four feet from where the weapon was fired. The initial search within a 10-foot radius of where decedent was found was unsuccessful.
The next morning Mull looked without success for shells within a 15-foot circle around the spot where decedent was found. A further search on that day of the area from the body site to the culvert produced two 16 gauge shotgun shells, one No. 6 shell and one No. 8 shell. In addition, a small amount of marijuana was found.
On Saturday, November 14, Mull received two telephone calls, one from Houchins and one from an anonymous person, providing information that defendants were involved in the homicide. However, before Mull acted on the information defendants on that day turned themselves in. Both gave statements and their shotguns were recovered.
As a result of defendants' statements, which included an allegation decedent had fired at them, Mull, Detective Wayne Price and Detective Ashman went to the scene of the shooting on November 16 in a further attempt to recover any spent *603 shells from decedent's rifle. In this search Price used a metal detector. Price searched within a circular area with a 25-foot radius from where decedent was found and also searched the field between the shed and the culvert and around the shed. Notwithstanding the fact that according to his wife decedent "very often" shot rats and rabbits near the pigpen, no spent shells were found. The police, however, did recover a spent 12 gauge shotgun shell from the culvert. Ballistics tests demonstrated that this shell and the two 16 gauge shells recovered earlier were fired from the shotguns recovered from defendants.
At the trial Price offered testimony tending to show that decedent had not fired his rifle. Price said that when he inspected it he saw dust on top of and in the barrel, suggesting to him it had not been recently fired, an opinion bolstered by the fact that there was no burnt-powder smell from the rifle as there would have been had the gun been fired recently. Chemical tests of the rifle showed it had been fired after its last cleaning but it could not be established whether or not the firing had been recent.
On this appeal Burks raises the following issues:
(1) The court's charge to the jury on self defense was plain error.
(2) The trial court erroneously overruled defendant's objection to the prosecutor's prejudicial and inflammatory remarks in summation.
(3) The court's charge on the law of accomplices was plain error.
(4) The trial court erred when it permitted the State to utilize scientific evidence which was not shown to possess a high degree of scientific reliability.
(5) The trial court's admission of opinion testimony constituted prejudicial error.
(6) The trial court erroneously admitted prejudicial hearsay into evidence.
(7) The court's failure to charge the jury on abandonment as a defense to trespass as requested by the defendant was prejudicial error.
(8) The trial court erroneously substituted an alternate juror during deliberations.
(9) The cumulative effect of all the errors necessitates a reversal.
King makes the following contentions:

*604 (1) Mr. Neal's pointing a rifle at Mr. King constituted excessive force and as Mr. King had no means of escape, he was entitled to utilize deadly force in defending his life.
(2) Mr. King was denied a fair trial as two jurors were sleeping during the course of important testimony and the trial judge did not demand their attention nor dismiss them.
It is quite clear that the judge in his charge made certain prejudicial errors. This case, of course, involved a claim of self-defense. We recently summarized the elements of self-defense as follows:

N.J.S.A. 2C:3-4 a provides that the `use of force upon or toward another person is justifiable when the actor reasonably believes that [it] is immediately necessary' for his self-protection `on the present occasion.' As a general rule, `a person employing protective force may estimate the necessity' of its use `without retreating.' N.J.S.A. 2C:3-4 b(3). However, `[t]he use of deadly force is not justifiable ... unless the actor reasonably believes that [it] is necessary to protect himself against death or serious bodily harm.' N.J.S.A. 2C:3-4 b(2). Nor is it justifiable if the actor `knows that he can avoid the necessity of using such force with complete safety by retreating....' N.J.S.A. 2C:3-4 b(2)(b). Under N.J.S.A. 2C:3-11 b, the term `deadly force' means `force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm' [State v. Harmon, 203 N.J. Super. 216, 222-223 (App.Div. 1985)]
Self-defense requires an actual, honest, reasonable belief by the defendant in the necessity of using force. State v. Kelly, 97 N.J. 178, 198 (1984). Further, the force against which a defendant uses self-defense must be unlawful. N.J.S.A. 2C:3-4a. Assuming there is evidence that a defendant acted in self-defense, the jury decides whether his belief was honest and reasonable. State v. Kelly, supra, 97 N.J. at 199-200. But even though the justification for a homicide is referred to as a defense, the jury need not find beyond a reasonable doubt that the defendant's belief was honest and reasonable. To the contrary, if any evidence raising the issue of self-defense is admitted in either the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts. Accordingly, a defendant must be acquitted if there is reasonable doubt as to whether he acted in self-defense. Id. at 200.
*605 We consider the jury charge against the above law. Here the judge told the jury:
Now, in conjunction in this case, the defendant [sic] contend that their use of deadly force against Mr. Neal was justifiable in protecting themselves against the use of unlawful force by Mr. Neal, which was used against them.
Under our law, it deals with what is called the law of justification. More commonly, it's the law of self-defense.
....
In this case, the State contends that Mr. Neal never fired his rifle at the defendants. If you find from the evidence that the State has proven this contention beyond a reasonable doubt, then, obviously, the defense of self-defense or justification is not applicable at all.
This charge, which was requested by the prosecutor, was wrong on a critical point in the case. Obviously there was a sharp dispute as to whether decedent fired his weapon and under the charge defendants could not be acquitted if decedent never fired. Yet it seems plain that while defendants may or may not have testified truthfully when they said decedent fired at them, they may have honestly and reasonably believed that they were justified in shooting by conduct of the decedent other than firing. The fact that a finding that decedent did not fire would be inconsistent with defendants' position would not preclude the jury from nevertheless finding they had an actual, honest and reasonable belief that they had to fire. See State v. Powell, 84 N.J. 305, 317 (1980). But in effect the judge ruled as a matter of law that an individual with a weapon who does not fire cannot generate a reasonable belief in a potential victim that shooting "is immediately necessary for the purpose of protecting [one's self] against the use of unlawful force by such other person...." N.J.S.A. 2C:3-4(a). While it is unquestionably true that a claim of self-defense would be stronger on behalf of a defendant actually fired upon, we are not prepared to hold that a person must wait until the other party acts before he takes defensive action as that ruling might well require a person to wait too long to protect himself.
We, of course, read the charge as a whole. Thus we recognize that the judge charged at one point that the "use of deadly force by the defendants upon or towards Mr. Neal is justifiable *606 when they reasonably believe that such force is necessary to protect himself [sic] against death or serious bodily harm." Unfortunately, however, he later qualified this statement by saying: "[w]hat I have just said applies only if you find that Mr. Neal did, in fact, fire his rifle in the direction of the defendants...." This mistake in the charge was clearly capable of producing an unjust result and requires a new trial. R. 2:10-2.
The trial court made a second error in the charge with regard to self-defense. Under N.J.S.A. 2C:1-13(a) and (b), an affirmative defense need not be disproved "until there is evidence supporting such defense," except in those cases where the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 et seq., or another statute requires a defendant to establish the affirmative defense by "a preponderance of evidence or such other standard." Thus, as self-defense is an affirmative defense not requiring its establishment by a defendant, N.J.S.A. 2C:3-1 and N.J.S.A. 2C:3-4(a), a defendant may raise self-defense as an issue if there is evidence supporting it. See State v. Kelly, supra, 97 N.J. at 200; State v. Galiyano, 178 N.J. Super. 393, 397 (App.Div. 1981), certif. den. 87 N.J. 424 (1981). Once there is evidence in the case of self-defense, even if produced by the State, the burden of proof is on the State to disprove self-defense beyond a reasonable doubt. Ibid.
In general, though he erroneously seemed to think that the question of whether decedent had fired was pivotal, the judge correctly stated that the burden of proof was on the State to show beyond a reasonable doubt that defendants had not acted in self-defense.[2] Unfortunately, however, after the judge told the jury the State's burden, he said:
The defendants have alleged and need only come forward with evidence of the level of preponderance to force the State to prove beyond a reasonable doubt that self-defense does not apply.
*607 This statement was highly prejudicial to defendants. As we have indicated, the judge told the jury self-defense was available only if the decedent fired and thus he placed the burden of proving that fact on defendants. This compounded the other error in the charge which required the jury to find decedent had fired in order for defendants to be acquitted by reason of self-defense. Under the charge, only if defendants met that burden was the State obliged to prove beyond a reasonable doubt that defendants did not actually, honestly and reasonably believe they had to fire. In short, the judge required defendants to meet a burden of proof before the jury could even consider self-defense. On the record, this error was clearly capable of producing an unjust result, a conclusion we reach as in light of the circumstances of this case that the claim of self-defense is not farfetched. See State v. Galiyano, supra, 178 N.J. Super. at 397-398. Accordingly for this additional reason defendants must be given a new trial.
We think it appropriate to consider certain other issues raised on this appeal as they may arise on the retrial. It has been urged that the judge should not have given an accomplice charge as the very nature of the offenses of aggravated manslaughter and manslaughter involve reckless conduct without a specific intent that the victim be killed, whereas an accomplice must have the intent that the underlying crime be committed.
On the unique facts here this issue does not require extended discussion. Whatever may be the appropriate ruling in other situations, here the evidence certainly would support a finding of shared intent. See State v. White, 98 N.J. 122, 129 (1984). Indeed while defendants were not indicted for it, on the record before us a murder conviction could have been returned against them. See also State v. Morales, 111 N.J. Super. 521, 525 (App.Div. 1970), certif. den. 57 N.J. 433 (1971).
The trial judge did not err in refusing to charge on abandonment of the shed, an issue thought to be germane on the question of whether decedent was using deadly force against a *608 burglar or trespasser. Burks' argument on appeal is that abandonment is a defense to trespass. N.J.S.A. 2C:18-3. However, as we view the record no finding could be made that the shed was abandoned.
As we previously set forth, Detective Price used a metal detector in an unsuccessful attempt to find spent shells from decedent's weapon. Evidence adduced on the admissibility of the detector at a hearing outside of the jury's presence showed that it was Price's personal property which he has owned since about 1968. The device detects aluminum, lead, copper and brass, the last being the metal contained in shell casings. Price indicated the device, depending on the composition of the soil, would detect items composed of these metals in soil up to six inches in depth. The detector is battery operated and had received a new battery a week before the homicide. Price never had the detector tested for accuracy.
The judge allowed the use of the evidence regarding the detector saying:
The court can make a finding without calling before it an expert in metallurgy that a metal detection device is a machine of such commonality that it needn't be established to have scientific worth. It's an aid just like a flashlight is an aid, just like a candle may be an aid to looking for something under particular circumstances. The fact that it was used is for the jury to consider. Whether or not it becomes persuasive to the jury is a matter of argument, based upon weight and not upon admissibility.
I, therefore, find, using the distinction as set forth in State vs. Chatman,[3] where the court was dealing with a flameless atomic absorption analysis test which is not something of commonality or even something that a court would even have heard of about [sic] for any independent private interests in atomic absorption that a trial judge might have had; that there's substantial difference between that an a metal detector device which is commonly used. It is also different from the State vs. Hibbs[4] electronic telephone tracing equipment, *609 because in Hibbs the State sought to use the equipment not only to show with finality, that is that the probability of error in using such equipment was virtually non-existent. In this case, the State does not seek to say that the use of the metal detector device with finality or that the shell is from the victim's gun was non-existent. The State merely is attempting to say that Detective Price utilized a machine and in the method that he utilized the machine he found no shell, which is not the same as saying a shell is non-existent.
The judge, however, cautioned the State that it may not argue to the jury that the detector's failure to locate a shell is proof the shell does not exist.
We are satisfied that the judge's finding that "a metal detection device is a machine of such commonality that it needn't be established to have scientific worth" is incorrect and thus the testimony of the use of the detector was improperly admitted. We are aware of no basis to conclude that its underlying principles of operation are such a matter of common knowledge that expert testimony is not required to support the admissibility of the results of the detector. See Angel v. Rand Express Lines Inc., 66 N.J. Super. 77 (App.Div. 1961). To the contrary we believe that the evidence involved "scientific, technical or other specialized knowledge." Evid.R. 56(2). Indeed even Price seemed uncertain as to how the device worked, though he believed it operated on "electromagnetic" principles. Further we cannot conclude from the evidence that the device, which was hardly new, was in proper operating order. See Romano v. Kimmelman, 96 N.J. 66, 82 (1984).
We recognize, of course, that the use of the evidence from the device was limited as it was not suggested that its negative findings were conclusive. Nevertheless we think the impact of the evidence was too great for its admission without proper foundation. Indeed, notwithstanding the judge's limitation on the use of the evidence, Mull was permitted to given an opinion in which he said beyond a reasonable doubt that in one of his three searches he would have found a shell if one had been there. This opinion should not be repeated at the retrial.
In reaching our result with respect to the detector we add a caveat. It is possible that defendants by cross-examination or *610 argument suggesting that no devices were used to look for shells might open up the trial to permit introduction of the evidence concerning the metal detector. Thus the trial judge at retrial will not be bound by our ruling if defendants ask the officers whether they used any equipment or device for searching or if defendants argue that the evidence did not show such a device was used. We will not require that the case be retried on a deceptive basis. See State v. Soney, 177 N.J. Super. 47, 57 (App.Div. 1980), certif. den. 87 N.J. 313 (1981).
It is asserted the court erred in allowing evidence from Houchins that he learned from a reliable source on the telephone Burks was involved in the killing, information Houchins passed on to Mull. Burks argues that the statement was offered for the truth of its content and was thus hearsay. The State asserts the statement was offered to show that Houchins was on notice that Burks might have been involved in the shooting and thus should be investigated.
Preminarily on this point we note that it is difficult to see how defendants could have been prejudiced by the evidence as Burks admitted he shot at decedent. Nevertheless under State v. Bankston, 63 N.J. 263 (1973), the statement should not have been admitted. Bankston indicated that the hearsay rule is not violated when a police officer justifies certain conduct, such as investigating a crime or a defendant, because of "information received." Id. at 270. But the court indicated that when the officer becomes more specific by repeating what some other person told him concerning a crime by the accused, the testimony violates the hearsay rule. Id. at 271. Here there was such specificity. In addition to violating the hearsay rule, the testimony violates the accused's Sixth Amendment right to be confronted by witnesses against him. Id. at 269. In view of the constitutional underpinning of State v. Bankston the evidence of the telephone call should not be reintroduced at a new trial.
In summation the prosecutor made the following remarks:

*611 Mrs. Neal and her family will be waiting for your answer in this case. Furthermore, the public in Cumberland County will be waiting for your answer in this case.
....
What you decide in this case matters to our society. The names of Joseph Burks and Gary King will soon be forgotten, but what you decide is the law in Cumberland County and under these circumstances, will not be quickly forgotten. You have to decide the following question:
What happens in Cumberland County to two armed burglars who are caught in the act by the property owner, and who then turn and violently take the life of that property owner?
I repeat to you, ladies and gentlemen, this is not reckless manslaughter. This is aggravated manslaughter. This was brazen and extreme indifference on the part of Burks and King to Mr. Neal's property, to Mr. Neal's rights and to Mr. Neal's life.
And now, the people of the State of New Jersey ask you to make these two alleged killers pay for their crime. You must not condone their vicious, heinous acts and you must not let it go unpunished.
Mrs. Neal and I will be waiting. And we have confidence, having seen you each day for the last two weeks, we have confidence in your intelligence, in your common sense, in your sense of justice to the memory of Elijah Neal, in your sense of fairness and in your ability to analyze the law as Judge Kleiner is about to give it to you, and to apply that law to the facts that you've heard over the last two weeks.
Notwithstanding his right to argue the State's case vigorously, we think that the prosecutor may have gone too far in some of these remarks. We thus bring the following cases to his attention and we presume he will consider them before the retrial. See State v. Blanton, 166 N.J. Super. 62, 68 (App.Div. 1979), certif. den. 81 N.J. 265 (1979), State v. Stewart, 162 N.J. Super. 96, 103 (App.Div. 1978), and State v. Plowden, 126 N.J. Super. 228, 232 (App.Div. 1974), certif. den. 64 N.J. 504 (1974).
At a sidebar conference during cross-examination of Price, Burks' attorney made the following comment: "Your Honor, if I may, Mr. Ritter,[5] we have two sleeping jurors." To this the judge replied, "So what?" The record then indicates the conference was concluded. There is no further explanation of the incident. While we think it unlikely to be repeated, we *612 believe something more should have been done. Certainly the judge should have ascertained if the jurors were sleeping and if so considered proper corrective measures.
While we reverse defendants' convictions, we recognize that the evidence supported the verdicts. Nevertheless the errors in this case do not involve mere technical matters. Rather they go to the heart of the fact finding process making the verdicts unreliable. See State v. R.W., 200 N.J. Super. 560, 568 (App. Div. 1985), certif. granted 101 N.J. 206 (1985). Thus a new trial must be ordered.
The judgments of conviction for aggravated manslaughter are reversed and the matter is remanded to the Superior Court, Law Division, Cumberland County, for a new trial on those counts. Burks' appeal from the conviction of violation of N.J.S.A. 2C:39-7 is dismissed. Of course, we do not disturb the judgments of conviction and sentences on counts four and five.
NOTES
[1] His notice of appeal indicates he was convicted of aggravated assault but it is clear that the notice was intended to apply to the aggravated manslaughter conviction as the sentence of 18 years with six years parole ineligibility is mentioned in the notice.
[2] On one occasion he said the burden was only by the preponderance of the evidence.
[3] State v. Chatman, 156 N.J. Super. 35 (App.Div. 1978), certif. den. 79 N.J. 467 (1978).
[4] State v. Hibbs, 123 N.J. Super. 108 (App.Div. 1972), on remand, 123 N.J. Super. 152 (Cty.Ct. 1972), aff'd 123 N.J. Super. 124 (App.Div. 1973), certif. den. 63 N.J. 253 (1973).
[5] Mr. Ritter was the assistant prosecutor.