723 A.2d 84 (1999)
318 N.J. Super. 123
STATE of New Jersey, Plaintiff-Respondent,
v.
Carolyn PEARSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 15, 1998.
Decided February 4, 1999.
*85 Ivelisse Torres, Public Defender, for defendant-appellant (Brian McCormack, Designated Counsel, of counsel and on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Bennett A. Barlyn, Deputy Attorney General, of counsel and on the brief).
Before Judges MUIR, Jr., KEEFE and EICHEN.
The opinion of the court was delivered by EICHEN, J.A.D.
Defendant was found guilty by a jury of fourth degree child abuse, N.J.S.A. 9:6-1 and 9:6-3 (counts one and two); second degree endangering the welfare of a child, N.J.S.A. 2C:24-4a (count three); and first degree aggravated manslaughter, as a lesser included offense of a charge of first degree murder of her four month old son, N.J.S.A. 2C:11-4a (count four). The jury acquitted defendant of first degree murder. The trial judge merged counts one and two into count three and sentenced defendant to thirty years in prison with a fifteen-year period of parole ineligibility on the aggravated manslaughter conviction and a concurrent ten-year term with five years parole ineligibility on the endangering the welfare of a child conviction. Appropriate fines and penalties were also imposed.
On appeal, defendant raises the following issues:
POINT I
*86 DEFENDANT'S TAPED STATEMENT VIOLATED THE HOLDING OF MIRANDA v. ARIZONA.[1]
POINT II
COUNSEL'S FAILURE TO PRESENT A DEFENSE ON BATTERED WOMEN SYNDROME CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL. (Not raised below.) POINT III
THE COURT ABUSED ITS DISCRETION WHEN IT SENTENCED THE DEFENDANT.
A. THE TRIAL COURT FAILED TO APPLY MITIGATING FACTORS.
1. MITIGATING FACTOR (11) "HARDSHIP."
2. MITIGATING FACTOR (4) "GROUND EXCUSING DEFENDANT'S CONDUCT THOUGH NOT ESTABLISHING A DEFENSE."
3. MITIGATING FACTOR (9) "DEFENDANT'S CHARACTER AND ATTITUDE INDICATE THEY ARE UNLIKELY TO COMMIT ANOTHER OFFENSE."
4. MITIGATING FACTOR (8) "CIRCUMSTANCES UNLIKELY TO RECUR."
B. THE COURT FAILED TO APPLY OR BALANCE AGGRAVATING AND MITIGATING FACTORS WHEN IT IMPOSED A MAXIMUM PERIOD OF PAROLE INELIGIBILITY.
C. THE TRIAL COURT'S SENTENCE VIOLATED THE HOLDING OF STATE v. ROACH.[2]
Our review of the record satisfies us that defendant's convictions must be reversed and the matter remanded for a new trial because the statement defendant gave to investigators at the Hudson County Prosecutor's Office was given in violation of her Miranda rights and because we are not convinced that the improper admission of the statement can be viewed as harmless error. In light of our decision, we find it unnecessary to address the issues raised in Points II and III of defendant's brief.
These are the relevant facts. On Monday, April 4, 1994, at approximately 8:30 a.m., Investigator John Appleyard and Investigator Anthony Strivolino of the Hudson County Prosecutor's Office arrived at an apartment in Jersey City on the report of a suspicious death. Investigator Appleyard testified that when he arrived at the apartment the police were present and he was escorted to a front room where he observed a dead male infant lying in a child's car seat. The investigator described the corpse as "a little in rough shape physically. He had what appeared to be a couple of bruises on the forehead, some drooping skin. He looked very thin." Present in the apartment were defendant, who was the infant's mother and her mother; an elderly female neighbor; and three of defendant's four other children, all of whom were under the age of five. The father, co-defendant Philip Carter, was not there.[3] The investigator testified that defendant was crying and appeared "distraught." He stated that defendant told him she had last fed the infant on Sunday around 7:30 a.m. and last saw him alive between noon and 1:00 p.m. on Sunday afternoon. She told the investigator that she left the infant in Carter's care while she slept and that when she awoke, at about 11:00 p.m. on Sunday night, she looked in on the child and then went downstairs to a neighbor where she remained until 7:30 a.m. Monday morning. She explained that she expected Carter to care for the child if he woke up. When defendant returned to the apartment and went to check on the infant at around 7:30 a.m. on Monday, he felt cold and stiff.
An autopsy conducted by the State Medical Examiner's Office between 1:00 p.m. and 5:00 p.m. that day reported the immediate *87 cause of death as "battered child syndrome with blunt impact cranial[,] cerebral[,] and cervical injuries"; "dehydration" and "extreme emaciation due to lack of food." The medical examiner testified that the corpse was in "very poor physical condition with evidence of chronic trauma," including head and neck injuries. The medical examiner also described the infant as looking like "an African kid you see in magazines from a Third World country, like victims of starvation.... He looked kind of like an old man more than he looked like a baby." Although he was unable to state the exact time of death, he did state that the infant died as the result of "[t]he combination of anatomical findings."
At the apartment, Investigator Appleyard questioned defendant as to why there was no infant formula. He testified that defendant had told him she had recently received a case of formula from a public assistance program known as "WIC,"[4] but he did not find any. The investigator stated that defendant attempted to rationalize the situation by explaining that she used Carnation evaporated milk when she ran out of formula. Investigator Appleyard described the apartment and defendant's children as filthy, noting there was only one dirty crib which apparently was used by the one year old child. After about an hour and one-half, Investigator Appleyard asked defendant to accompany him to the Hudson County Prosecutor's Office, and she agreed to do so. He did not advise her that she was free to refuse his request.[5]
At 9:45 a.m., Investigators Appleyard and Strivolino put defendant in the back of their unmarked vehicle and drove her to the prosecutor's office where, at approximately 10:00 a.m., she was placed in a ten-by-ten-foot room in the homicide unit for further questioning. Defendant remained alone in the room for more than an hour before the questioning began. Thereafter, Investigators Appleyard and Strivolino seated themselves on either side of her and conducted a preliminary interview. Defendant then took the oath and gave a formal tape-recorded statement. The taped statement, comprising twenty-five pages of transcribed questions and answers, was recorded between 11:35 and 11:59 a.m. In the statement, defendant denied that she had physically abused the infant. She stated that the child had been born addicted to cocaine,[6] but when specifically asked whether she "[did] cocaine" on Sunday, she responded "no." She did, however, admit that she and co-defendant occasionally inhaled cocaine and that she had used the drug on the Thursday preceding the infant's death. She also admitted to drinking alcohol.
At no time was defendant told that her presence at the prosecutor's office was voluntary or that she was free to leave. Nor was she advised of her Miranda rights. Even after giving her statement, she was not told she could leave, and in fact, she remained in the prosecutor's office until she was formally arrested later that day, presumably after the medical examiner reported the autopsy results.
Investigator Appleyard testified that he took defendant to the prosecutor's office because he wished to question her further and it was too chaotic to continue the questioning in the apartment. He also indicated that he did not consider defendant to be "a suspect" inasmuch as the infant's death might have been a SIDS death.[7] Additionally, he noted that at the end of the interview defendant answered "no" to the question of whether any pressure or coercion was used to force or compel her to give the statement.
At the conclusion of the Miranda hearing, the trial judge determined that defendant's statements should be admitted despite the *88 investigator's failure to give defendant Miranda warnings. The court concluded that Miranda did not apply here because defendant was not in custody and was free to leave at any time during the interview. He determined that the interview was held at a time when it was not clear to the investigator whether he was investigating a homicide or an accidental death and therefore defendant was not a "suspect" in a homicide. Although the court acknowledged that the infant appeared to be "in a state of dehydration and malnutrition," it nonetheless concluded that there was nothing to suggest to the investigator, not even a "hint," that there was "mistreatment by the mother and a homicide," and concluded that Investigator Appleyard was "not asking questions [in the apartment] to determine that [she was] a suspect." The court then indicated that defendant's statements were voluntary and not coerced and therefore would be admitted into evidence.
It is well settled that Miranda warnings are required when a person is subject to "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Ibid. Absent Miranda warnings, statements made by a defendant in custody, whether exculpatory or inculpatory, may not be used in the prosecutor's case-in-chief. State v. Hartley, 103 N.J. 252, 275, 511 A.2d 80 (1986).
"Miranda turns on the potentially inquisitorial nature of police questioning and the inherent psychological pressure on a suspect in custody." State v. P.Z., 152 N.J. 86, 102, 703 A.2d 901 (1997) (citing Miranda, supra, 384 U.S. at 445-58, 86 S.Ct. at 1612-19,16 L.Ed.2d at 707-14). Moreover, it "[is] the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning [is] conducted" which implicates the Miranda requirements. Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293, 299 (1994) (quoting Beckwith v. United States, 425 U.S. 341, 346, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 7 (1976)). Indeed, unless the officer's beliefs are conveyed in some way to the person being interrogated or interviewed, they do not affect the Miranda custody inquiry; a law enforcement officer's beliefs are "relevant only to the extent they influence[ ] the objective conditions surrounding[the] interrogation" and "would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her `freedom of action.'" Id. at 325, 114 S.Ct. at 1530, 128 L.Ed.2d at 300 (quoting Berkemer v. McCarty, 468 U.S. 420, 440,104 S.Ct. 3138, 3150, 82 L. Ed.2d 317, 335 (1984)). Hence, subjective beliefs may be only one among many factors bearing upon the determination of whether an individual is in custody. Ibid.
Hence, the test is an objective one which focuses on the totality of the circumstances. Ibid.; see also P.Z., supra, 152 N.J. at 102-03, 703 A.2d 901. Those circumstances include the time and place of the interrogation, the length of the interrogation, the nature of the questions, the conduct of the police, the status of the interrogator, the status of the suspect, and other such factors. See P.Z., supra, 152 N.J. at 103, 703 A.2d 901; State v. McLaughlin, 310 N.J.Super. 242, 252, 708 A.2d 716 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998); State v. Coburn, 221 N.J.Super. 586, 595-96, 535 A.2d 531 (App.Div.1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988).
In State v. Coburn, we explained that "the standard is the objective reasonable man test." 221 N.J.Super. at 596, 535 A.2d 531. There, we indicated that "custody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely." Ibid.; accord State v. O'Loughlin, 270 N.J.Super. 472, 477, 637 A.2d 553 (App.Div.1994). Accordingly, courts are directed always to apply a case-by-case approach in which the totality of the circumstances are examined in determining whether a "custodial interrogation" has occurred. O'Loughlin, supra, 270 N.J.Super. at 477, 637 A.2d 553; State v. Godfrey, 131 N.J.Super. 168, 177, 329 A.2d 75 *89 (App.Div.1974), aff'd o.b., 67 N.J. 267, 337 A.2d 371 (1975).
In this case, from the outset of the investigation both the investigators and defendant had to have been aware that the infant expired under suspicious circumstances. The dead infant appeared emaciated, dehydrated and bruised. Just observing the corpse revealed the child had suffered severely at the hands of his supposed caretakers. Indeed, the medical examiner compared him to a third-world victim of starvation. Investigator Appleyard had seen the infant's pitiable condition and the deplorable state of the apartment. He also knew that defendant was the infant's mother and the person charged with his care and well-being. Thus, it strains credulity to conclude, as the trial court did here, that Investigator Appleyard believed that the infant's death was accidental; rather, it had to be apparent to both defendant and the investigator that defendant had contributed to his death in some respect. In deciding whether defendant was free to leave the prosecutor's office, the trial court placed too much emphasis on the investigator's subjective belief that the infant might have died of SIDS or some other accidental cause. As previously noted, it is not the subjective views of the interrogator that governs the determination of "custody," but the objective surrounding circumstances that are determinative. Stansbury, supra, 511 U.S. at 323, 114 S.Ct. at 1529, 128 L. Ed.2d at 298.
Those circumstances here included the horrific condition of the dead infant, as well as the inherently coercive physical environment of the prosecutor's office, the length of time defendant remained at the office, and the nature of the questions put to defendant. These were such that a reasonable person in defendant's position would have realized she was a target of the prosecutor's investigation and was not free to leave.
Defendant was placed in a small room alone where she remained unattended for an hour before any questioning began. She was then joined by two investigators who sat on either side of her, interviewing her for more than one-half hour before she gave a formal statement. Additionally, before the questioning began, defendant was warned of the solemnity of the oath, was sworn to tell the truth, and was then asked questions designed to elicit incriminating responses concerning the infant's care and defendant's alcohol and cocaine use at or about the time the infant expired.
In these circumstances, we are persuaded that the court erred in admitting the statement. Defendant was "in custody" and was therefore entitled to Miranda warnings before she was interrogated. As a result, defendant's statement to the investigators at the prosecutor's office should have been excluded.
This finding of a Miranda violation does not end our inquiry, however. We must examine the consequences that flow from that violation. If the admission of defendant's unwarned statement had the clear capacity to cause an unfair result, then the convictions must be reversed and a new trial ordered. In other words, we must determine whether the erroneous admission of defendant's incriminating statement was harmless beyond a reasonable doubt. See State v. McCloskey, 90 N.J. 18, 29, 446 A.2d 1201 (1982) (applying harmless error standard to determine whether reversal was required when statement was admitted against defendant in violation of his constitutional right against self-incrimination); see also State v. Spruell, 121 N.J. 32, 42-43, 577 A.2d 821 (1990) (observing that regardless of whether an error is of constitutional dimension, "[t]he ultimate inquiry [must] focus[ ] on the possibility of injustice `sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" (citation omitted)).
In this case, the jury convicted defendant of aggravated manslaughter, rejecting the lesser included offense of reckless manslaughter. N.J.S.A. 2C:11-4a provides that a person is guilty of aggravated manslaughter when he or she "recklessly causes death under circumstances manifesting extreme indifference to human life." In contrast, a conviction for reckless manslaughter requires only that the conduct causing death be committed "recklessly." N.J.S.A. 2C:11-4b(1). *90 Recklessness under circumstances "manifesting extreme indifference to the value of human life ... is significantly more serious than ordinary reckless conduct." State v. Farrell, 250 N.J.Super. 386, 390, 594 A.2d 1338 (App.Div.1991). The higher degree of recklessness involves not just a possibility that death will occur, but a probability of its occurrence. State v. Curtis, 195 N.J.Super. 354, 364-65, 479 A.2d 425 (App. Div.), certif. denied, 99 N.J. 212, 491 A.2d 708 (1984). Thus, to convict a defendant of aggravated manslaughter, the State must prove not only that the defendant acted recklessly but also that he acted "under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4a.
This additional element focuses on the circumstances under which the defendant acted, rather than the defendant's state of mind. Curtis, supra, 195 N.J.Super. at 364-65, 479 A.2d 425; see also State v. Saunders, 277 N.J.Super. 322, 326, 649 A.2d 885 (App.Div.1994), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995). If the defendant's actions created a probability as opposed to the mere possibility of death in light of the attendant circumstances, then the defendant is deemed to have acted with extreme indifference to human life. Curtis, supra, 195 N.J.Super. at 364, 479 A.2d 425.
We are convinced that, given the evidence of the infant's pitiable condition, the improperly admitted evidence of defendant's use of cocaine near the time of the infant's demise had to have contributed to the jury's conclusion that defendant acted with "extreme indifference to human life," resulting in her conviction for aggravated manslaughter. See N.J.S.A. 2C:11-4a. That this evidence was capable of having such an effect is reflected in the prosecutor's argument in summation which drew a connection between defendant's "chronic" drug habit, the suspicious disappearance of the free infant formula provided by WIC, implying it had been sold to obtain money to buy drugs, and the child's physical condition and resulting death. Without the improperly admitted evidence of recent cocaine use and the prejudicial inferences that a jury could reasonably have drawn from the missing formula, we cannot state that a jury would have found defendant guilty of aggravated manslaughter beyond a reasonable doubt. The jury would have to have concluded that defendant's recklessness was so "extreme" that defendant "did not care whether [her son] lived or died." Curtis, supra, 195 N.J.Super. at 367, 479 A.2d 425.
Notably, defendant moved to redact those damaging portions of the statement, but the trial court rejected defendant's motion. Had the court acceded to the request, the error might well have been viewed as harmless. We recognize the jury knew defendant had used cocaine in the past, as reflected by her trial stipulation that the infant was born addicted to the drug, but the evidence depicting defendant as an ongoing drug addict creates a "reasonable possibility" that the evidence of her recent use contributed to the conviction. See State v. Macon, 57 N.J. 325, 339, 273 A.2d 1 (1971). Hence, the error in admitting the statement during the State's case-in-chief contrary to Miranda`s requirements cannot be condoned as harmless error. There is a strong "possibility of injustice, `sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Spruell, supra, 121 N.J. at 43, 577 A.2d 821 (quoting State v. Melvin, 65 N.J. 1, 18-19, 319 A.2d 450 (1974)). Accordingly, we are convinced defendant was denied "a fair trial and a fair decision on the merits." Macon, supra, 57 N.J. at 338, 273 A.2d 1.
The judgment of conviction is reversed, and the matter is remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L. Ed.2d 694, 726 (1966).
[2] State v. Roach, 146 N.J. 208, 680 A.2d 634, cert. denied, ____ U.S.____, 117 S.Ct. 540, 136 L. Ed. 2d 424 (1996).
[3] Defendant and co-defendant Philip Carter were charged in a single indictment. Their trials were severed. Subsequently, Carter pleaded guilty to one count of aggravated manslaughter and, in accordance with the plea agreement, received a sentence of twenty years with parole eligibility to be determined by the State Parole Board.
[4] "WIC" is a supplemental feeding program for women, infants and children on public assistance. At trial, a WIC representative confirmed that defendant had recently received formula.
[5] Defendant does not contend that she was entitled to Miranda warnings before being questioned in the apartment.
[6] Although defendant did not testify at trial, she stipulated that the infant had been born addicted to cocaine. Significantly, she did not stipulate to any drug use after the infant's birth.
[7] "SIDS" stands for "Sudden Infant Death Syndrome."