896 A.2d 1125 (2006)
385 N.J. Super. 211
STATE of New Jersey, Plaintiff-Respondent,
v.
Brendan F. O'CARROLL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 22, 2006.
Decided May 4, 2006.
*1127 Yvonne Smith Segars, Public Defender, attorney for appellant (Al Glimis, Assistant Public Defender, of counsel and on the brief).
Zulima V. Farber, Attorney General, attorney for respondent (Russell J. Curley, Deputy Attorney General, of counsel and on the brief).
Before Judges WECKER, FUENTES and GRAVES.
The opinion of the court was delivered by
*1128 WECKER, J.A.D.
Monmouth County Indictment No. 01-06-1164 charged defendant, Brendan O'Carroll, with one count of first-degree murder, N.J.S.A. 2C:11-3, in the death of Theresa Nieves. After a Miranda[1] hearing, the trial judge denied defendant's motion to suppress statements he made while in custody.
On December 3, 4, 5, 10, 11 and 12, 2002, defendant was tried by a jury. The jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3. The judge rejected the State's motion to impose a discretionary extended term as a persistent offender, pursuant to N.J.S.A. 2C:44-3a and N.J.S.A. 2C:43-7a(6), and sentenced defendant to thirty years in state prison with no eligibility for parole.
We conclude that it was plain error (1) to charge the jury only on murder and passion/provocation manslaughter, omitting lesser included charges on aggravated and reckless manslaughter; and (2) to omit self-defense as an element the State was required to disprove on the murder charge. We therefore reverse defendant's conviction and remand for a new trial.
On January 1, 2001, using a telephone cord, defendant strangled Theresa, with whom he had lived for six years and was raising two children. After killing Theresa, defendant placed her body into his automobile, drove into a parking lot behind a K-Mart store, put her body on a snow bank, and covered it with snow.
The State contended at trial that defendant knowingly and purposefully murdered Theresa. Defendant did not testify, but his statement to police, admitting that he killed Theresa, was read to the jury. The defense argued both in opening and in closing that the killing was passion/provocation manslaughter, telling the jury that the defense did not claim it was an "accident." The defense version was that he and the victim had been arguing, that Theresa came toward him with a steak knife and was pushing her away into the bathroom (where defendant claimed he was taking the telephone to call a friend), and in trying to stop her, as well as out of his developing anger, he pulled the telephone cord around her neck.
At trial, the State presented several witnesses in support of its case for purposeful murder. The manager at the restaurant where Theresa worked testified that at about 4:30 p.m. on the day she was killed, he called her house when she was about an hour late for work. The first time he called, he left a message. He called again at about 7:00 p.m. and spoke to her "boyfriend," who told him that Theresa was not at home and that he had dropped her at work at about 2:00 p.m.
Theresa's friend, Jennifer Graziano, testified that at approximately 6:30 p.m. the same day, "around dinner time," defendant called and told her that Theresa had not shown up for work after he dropped her there. Graziano testified that on January 4, 2001, she went with defendant to the Asbury Park Police Department, and then to the Ocean Township Police Department, to file missing persons' reports about Theresa's disappearance. Asbury Park Police Officer Anthony Napoleone testified that defendant told him that Theresa had been missing for several days, since he dropped her at work on January 1. Patrolman Kevin Meseroll of the Ocean Township Police Department testified that defendant told him the same story.
At about noon on January 4, 2001, a truck driver discovered Theresa's body at the K-Mart in West Long Branch. Detective Keith Coleman of the Monmouth *1129 County Prosecutor's Office testified that he questioned defendant on the evening of January 4, 2001, because defendant was the last person to see her. Detective Coleman testified that defendant suggested that Theresa could be with an ex-boyfriend in Connecticut or a "black guy that she met from a rehab." Coleman testified that after defendant had been read his Miranda rights, he gave a formal statement on January 4, telling the same story. The jury heard that statement, which defendant gave on January 4, before he was a suspect, and in which he continued the false version of the victim's disappearance.
Dr. Jay Peacock, the Chief County Medical Examiner and a board-certified forensic pathologist, testified that Theresa died from asphyxia due to strangulation. He also testified that the telephone cord from defendant's apartment matched the marks on Theresa's neck, and that there were three different ligature marks on her neck. On cross-examination, he agreed that the multiple marks could be explained by the cord becoming repositioned during the struggle.[2] He testified:
[The cord could have been] wrapped around the neck. There is a way that the marks could be recreated by wrapping the ligature around the neck. There is also as we have mentioned possibly for it to be held in such a way that they merge together. So that it's not, it is held tight, released, held tight, released, held tight . . . [there are] at least [those] two ways you could get that recreation of those marks.
Strangulation causes the brain to be deprived of oxygen. When asked how long it would take for a person to die as a result of strangulation, Dr. Peacock testified in detail as to how much time it would take for a victim of strangulation to lose consciousness, to suffer reversible damage and then irreversible damage, and ultimately to die. He testified that in a controlled experimental setting, a person whose carotid arteries are compressed will lose consciousness in ten to fifteen seconds, but spontaneously resume breathing and regain consciousness when the pressure is released. After about a minute and a half, cardiopulmonary resuscitation (CPR) is required in order to restart breathing, but no irreversible brain damage is likely. If, however, pressure is maintained for between four and six minutes, the person may be revived by CPR but will suffer irreversible brain damage. Finally, if pressure on the carotid arteries is continued for ten minutes, brain death will result. On cross-examination, Dr. Peacock testified that those time periods are ranges, and he could not definitely state how long it would take for a person to reach each stage in every strangulation case. Several factors would come into play, including the particular victim and the extent of the pressure applied.
Sergeant Frank Cavalieri of the Monmouth County Prosecutor's office testified that on January 5, 2001, after reading defendant his Miranda rights, he questioned *1130 defendant at the West Long Branch Police Department. At that time, Cavalieri knew that the cause of Theresa's death was strangulation. During that questioning, and after being confronted with some of the facts known to the detectives, defendant confessed to the killing. After Miranda warnings were re-read to him, he signed a statement describing the circumstances: that he accidentally killed Theresa during an argument that began when she threatened him with a steak knife.
[S]he had a face on her and I said, what's wrong. She was like, nothing, every time I'm with you there's gotta be something wrong. Can't I just sit here and watch TV. You know, like I said, she had a real bitchy attitude, or whatever. She was just like nasty and bitchy, you know, just snappy. We just started having words, you know, anything I said to her and everything she said back to me was like a snappy comment or sarcastic. And I asked her since we didn't get to do nothing for New Year's Eve and she would be getting out of work earlier, you know, could we do something New Year's night. Theresa turned around and said, you know, we'll see and that's when I turned around and I said to her, I guess, you know, you'll have to wait and see if you have a better offer for tonight than me. . . Then there was just like words, I can't remember everything, you know, exactly what words were said. I got up and I, you know, I stomped into the kitchen . . . I was pouring my glass of iced tea at the counter. Theresa came in as I was getting ready to put the pitcher back in the refrigerator and Theresa said, I want the bagels. I went back into the living room and sat back down on the couch . . . I got mad at something she said . . . I just yelled into her into the kitchen . . . Theresa came out of the kitchen and into the living room. She had a knife in her hand . . . Theresa was waving the knife, saying, you know, you mother fuckers. . . she went back into the kitchen . . . I got up to grab the phone to call a friend of mine . . . I said, that's it, I'm not taking no more. She turned and said, what are you doing, calling the fucking police now because I have a knife in my hand . . . I was going into the bathroom. . . I went to close the bathroom door and that's when Theresa stood in the way . . . she had the knife in her right hand . . . all I could see out of the corner of my left eye was the knife was right here, about two or three inches from my face . . . I said, what are you gonna do, kill me . . . The way her arm moved, it looked like the knife was coming closer to me and I believed that she was going to stab me. . . .
Defense counsel sought to demonstrate to the jury that although defendant may have acted knowingly, he strangled Theresa under circumstances that met the definition of passion/provocation manslaughter. Counsel argued that the provoking incident was an argument with Theresa, followed by her approach with a knife, all a culmination of an abusive relationship in which defendant was the victim.[3] The defense called several witnesses who testified about incidents of Theresa's physical violence toward defendant. Two witnesses, April O'Carroll, defendant's ex-wife, and Angel Vallone, a childhood friend of Theresa, each testified to having seen Theresa assault defendant years earlier. Ms. O'Carroll testified that she saw:
Theresa beating [defendant] and kicking him . . . Brendan was laying [sic] on the *1131 ground and she was punching him and kicking him ... kicking him in the leg and punching him in the face ... He was just laying [sic] there and taking it.
Vallone testified that the first time she saw Theresa hit defendant was when the three were in a car smoking marijuana, and defendant dropped the marijuana cigarette on Theresa.
He was passing the cigarette to her and it ... fell on her leg and she had a skirt on with stockings and her immediate reaction was to hit him ... in the face.
Another time that they fought, according to Vallone, was when Theresa and defendant were living temporarily with Vallone, and Vallone had been sleeping in the living room.
[W]hen [defendant] got home from work, [Theresa] wasn't home and she didn't get home until after I was sleeping. I guess he heard her come in or heard her pull up. He met her downstairs. I heard them arguing in the hallway. And they brought it into the living room. And they were fighting, screaming and yelling. She was hitting him and he was blocking her hits ... She was hitting him like she was attacking him and he was holding his hands up dodging her hits, blocking himself from getting hit.
Vallone testified that she never saw defendant hit Theresa.
The decedent's sister, Paula Nieves, who testified for the State, also testified that defendant's relationship with Theresa had been deteriorating shortly before her death, that Theresa wanted to leave defendant, and that Theresa frequently stayed out overnight. She also testified that once, during an Easter egg hunt, defendant hid an egg where Theresa did not want it to be hidden; Theresa yelled at him and hit him, and defendant responded by walking away. On the day Theresa was killed, Paula was living in the apartment along with Theresa, defendant, and the two children. Neither Paula nor the children were at home when Theresa was killed. Paula would take both children to stay with her at her grandmother's on alternate weekends (including the weekend that ended with her sister's death), to give defendant and her sister "a break." According to Paula, defendant was the primary caretaker for both children while the victim worked, but also while she regularly went out with other men and even stayed out overnight. It was defendant who had cared for the children while Theresa was in jail on a drug charge, and while she was in an inpatient rehabilitation facility for two weeks.
Graziano, Theresa's friend, also was called by the State. She testified that defendant knew that Theresa was cheating on him, but Graziano never knew defendant to be violent toward Theresa. Graziano did, however, hear Theresa threaten to punch defendant in the face once, when defendant was verbally abusing their daughter.

II
On appeal, defendant presents these arguments:
POINT I
THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF AGGRAVATED MAN SLAUGHTER AND RECKLESS MANSLAUGHTER CONSTITUTED A VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10. (Partly Raised Below).
POINT II

*1132 THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSES OF AGGRAVATED MAN SLAUGHTER AND RECKLESS MANSLAUGHTER ON AN IMPERFECT SELF-DEFENSE THEORY CONSTITUTED A VIOLATION OF DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10. (Not Raised Below)
POINT III
DEFENDANT'S MURDER CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT FAILED TO REVIEW THE RECORD TO DETERMINE WHICH JURY CHARGES WERE CLEARLY INDICATED, AND CONSEQUENTLY, FAILED TO INSTRUCT THE JURY ON SELF-DEFENSE AND THEREBY DENIED DEFENDANT HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10. (Partly Raised Below).
POINT IV
DEFENSE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS TRIAL ATTORNEY FAILED TO REQUEST A JURY INSTRUCTION ON SELF-DEFENSE AND/OR IMPERFECT SELF-DEFENSE. (U.S. CONST. AMEND. VI; N.J. CONST. (1947), ART. 1, PARA. 10).
POINT V
THE PROSECUTOR'S REPEATED MISCONDUCT DURING SUMMATION VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS AND DENIED HIM A FAIR TRIAL (U.S. CONST. AMEND. XIV; N.J. CONST. (1947) ART. I, PAR. 10). (Not Raised Below).
We have carefully reviewed the record in light of defendant's contentions on appeal, and we conclude that it was plain error to omit instructions that would have allowed the jury to consider the lesser-included offenses of aggravated and reckless manslaughter, as well as the justification of self-defense. Those errors require us to grant defendant a new trial.

III
We first address the omitted manslaughter charges. "[N]o defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense." State v. Muhammad, 182 N.J. 551, 577, 868 A.2d 302 (2005) (citing State v. Garron, 177 N.J. 147, 180, 827 A.2d 243 (2003), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361, 840 A.2d 242 (2004) (citing State v. Jordan, 147 N.J. 409, 421-22, 688 A.2d 97 (1997)).
Defendant did not request the trial court to charge the jury on these lesser-included offenses. After first raising the issue, defense counsel requested the judge not to charge the jury on these offenses. Our review is therefore one of plain error; we will not reverse unless the error was "clearly capable of producing an unjust result." R. 2:10-2; Jenkins, supra, 178 N.J. at 361, 840 A.2d 242 (a conviction will not be overturned if the error was not "[c]learly capable of producing an unjust result such that a reasonable doubt is *1133 raised as to whether the error led the jury to a result it otherwise might not have reached") (quoting State v. Brims, 168 N.J. 297, 306, 774 A.2d 441 (2001)).
Under the Criminal Code, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8e. A trial judge, however, "has an independent obligation" to instruct the jury on lesser-included charges when the evidence "clearly indicate[s] that a jury could convict on the lesser while acquitting on the greater offense." Jenkins, supra, 178 N.J. at 361, 840 A.2d 242 (citing Garron, supra, 177 N.J. at 180, 827 A.2d 243).
Very simply, where the facts on record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest.... The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done.
[Garron, supra, 177 N.J. at 180, 827 A.2d 243 (citing State v. Powell, 84 N.J. 305, 319, 419 A.2d 406 (1980))].
Defendant relies on Powell, contending that the jury has a constitutional obligation to render a verdict based on the evidence, even where the prosecutor and the defense urge the court not to charge a lesser offense that was not alleged in the indictment. The State contends that the judge correctly found no evidence to support either aggravated or reckless manslaughter; in other words, the record did not demonstrate a rational basis for convicting defendant of either aggravated or reckless manslaughter. The State also contends that because the defendant asked the judge not to charge the jury on the lesser-included crimes, in effect inviting the error, he cannot now claim that the judge erred.
The issue is one of law, and our review is de novo. See Manalapan Realty L.P. v. Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).

A
We agree with defendant's contention that despite his counsel's request to the trial judge not to charge the jury with these lesser included offenses, the judge had a duty to provide the jury with the alternatives of aggravated and reckless manslaughter. In the charge conference, the judge initially suggested that the only charges demonstrated by the evidence were murder and passion/provocation manslaughter:
[S]eems to me that this case is a three question case to the jury.
First question is on the charge of murder, (a) verdict is not guilty of murder and not guilty of passion/provocation manslaughter. (B), we find defendant guilty of passion/provocation manslaughter; or (c), guilty of murder. I don't know if there is anything else.
When defense counsel suggested the possibility of aggravated and reckless manslaughter charges, the judge stated: "[t]here has to be some evidence of it." Defense counsel replied:
Well, I'm not saying that it's a strong argument advanced by the defense but a jury could find that the time period between loss of consciousness and irreversible death involves a conscious disregard of a substantial and unjustified risk that death could have either possibly resulted or probably resulted.
That is what brings into play the aggravated manslaughter and manslaughter... Really, it's murder accept [sic] for the last element....
*1134 After defense counsel's explanation, the judge and the prosecutor acknowledged that there could be a rational basis for the lesser-included charges:
THE COURT: I don't have any difficulty with that one except if that is what your argument is. I didn't know that was going to be part of your thought process.
[DEFENSE ATTORNEY]: To be honest, I don't even know if I'm going to articulate it in my summation but just reading the language of aggravated manslaughter and manslaughter, the definition of reckless conduct, I believe there is a rational basis.
THE COURT: Could be, that could be. [to the State's attorney], what do you think?
[THE STATE]: I agree, Judge.
Nonetheless, defense counsel subsequently asked the judge not to charge the jury on aggravated or reckless manslaughter:
I went over it with my client and asked him to think about it ... whether he wanted me to argue it [the charges of aggravated manslaughter and reckless manslaughter]. He agrees with my position this is a very clear cut argument here. It's either murder or passion/provocation manslaughter. We're requesting that the court not charge lesser include [sic] of aggravated manslaughter or manslaughter.
The judge ultimately charged the jury only on murder and passion/provocation manslaughter:
The defendant is charged in this indictment... with the murder of Theresa Nieves ... A person is guilty of murder if he one, caused the death or serious bodily injury that then resulted in death. Two, that he did so purposely or knowingly. And three, that he did not act in the heat of passion resulting from a reasonable provocation ...
If you find, beyond a reasonable doubt, that [defendant] purposely or knowingly caused Theresa Nieves's death or serious bodily injury that then resulted in her death and that he did not act in the heat of passion resulting from a reasonable provocation, he would be guilty of murder.
If, however, you find that he purposely or knowingly caused death or serious bodily injury that then resulted in death and that he did act in the heat of passion resulting from a reasonable provocation, then he would be guilty of passion/provocation manslaughter.
A criminal homicide is murder when "(1) the actor purposely causes death or serious bodily injury resulting in death; or (2) the actor knowingly causes death or serious bodily injury resulting in death...." N.J.S.A. 2C:11-3a. A criminal homicide is passion/provocation manslaughter when it "[i]s committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4b(2). Passion/provocation manslaughter requires proof of four elements: "the provocation must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must actually have impassioned the defendant; and the defendant must not have actually cooled off before the slaying." Cannel, New Jersey Criminal Code Annotated, comment 4 on N.J.S.A. 2C:11-4 (2005) (quoting State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990)).
"[P]assion/provocation manslaughter involves the same purposeful or knowing culpability requirement [as murder], as it involves what otherwise would be murder but for its being `committed in the heat of passion resulting from a reasonable provocation.'" State v. Pridgen, 245 N.J.Super. 239, 251, 584 A.2d 869 (App. *1135 Div.) (quoting N.J.S.A. 2C:11-4b(2)), certif. denied, 126 N.J. 327, 598 A.2d 886 (1991).

B
We now consider whether the evidence provided a rational basis for the jury to have found defendant guilty of aggravated or reckless manslaughter and not murder. A homicide is aggravated manslaughter when "[t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4a(1). A homicide is manslaughter when "[i]t is committed recklessly," N.J.S.A. 2C:11-4b, that is, when the perpetrator "consciously disregards a substantial and unjustifiable risk [death] will result from his conduct." See N.J.S.A. 2C:2-2b(3). The question is whether the judge should have charged this jury with aggravated and reckless manslaughter.
The Court in Jenkins, faced with the same question, concluded that although defense counsel had requested the judge not to give the lesser-included charges, the trial judge erred in deciding not to give the jury instructions on aggravated manslaughter and reckless manslaughter. Jenkins, supra, 178 N.J. at 354-56, 840 A.2d 242. The defendant in that case had slammed a brick into the decedent's head, causing him to fall down a flight of stairs, landing head first on the concrete. Id. at 354, 840 A.2d 242. The autopsy report revealed that the brick probably caused the decedent to lose consciousness, but it was the fall to the pavement that caused the skull and brain injuries resulting in his death. Ibid.
Defense counsel in Jenkins had asked the lower court not to charge the lesser-included offenses because he preferred to "gamble with an all-or-nothing approach on the murder charge." Id. at 356, 840 A.2d 242. The State argued that the court was obligated to charge the lesser-included offenses but the trial judge held that "because there was no doubt that defendant struck [the decedent] either knowingly, purposefully, or intentionally, the facts did not support a charge on any lesser-included homicide offenses." Ibid. On appeal, defense counsel reversed positions, arguing that the court should have ignored his request at trial and instructed on the lesser-included offenses. Id. at 357, 840 A.2d 242. This court agreed and vacated the murder conviction.
The appellate court found that, based on the evidence presented, a jury could have reasonably concluded that defendant intentionally struck [the decedent] without being `practically certain' that the attack would kill but, nevertheless, in reckless disregard of the probability or possibility that death might result.
[Ibid.]
The Supreme Court, noting the trial judge's view that there was "[n]o evidence of anything other than an intentional act that ultimately resulted in death," and that no jury could "rationally find the existence of mere reckless conduct," found the judge's reasoning flawed. Id. at 362, 840 A.2d 242. The Court affirmed our decision ordering a new trial because the trial judge had failed to address the different mental states that define murder, aggravated manslaughter, and reckless manslaughter. Jenkins, supra, 178 N.J. at 362-64, 840 A.2d 242.
To be guilty of [serious bodily injury] murder, the defendant must have knowingly or purposely inflicted serious bodily injury with actual knowledge that the injury created a substantial risk of death and that it was `highly probable' that death would result. In aggravated manslaughter, by contrast, the defendant must have caused death with an `awareness and conscious disregard of the *1136 probability of death.' If, instead, the defendant disregarded only a `possibility' of death, the result is reckless manslaughter.
[Id. at 363, 840 A.2d 242 (citing State v. Breakiron, 108 N.J. 591, 605, 532 A.2d 199 (1987); State v. Pearson, 318 N.J.Super. 123, 136, 723 A.2d 84 (App. Div.1999))].
The Court found that "[t]he pivotal question" was:
whether the jury could have concluded that defendant hit the victim without conscious knowledge that death was a high probability but, instead, with reckless disregard of the possibility or probability that death would occur. Without passing on the credibility of the evidence itself, we agree with the Appellate Division that a jury might have so concluded.
[Ibid.]
The issue to which the jury should have been directed was the "defendant's state of mind as to the risk of death." Ibid. The evidence demonstrated that the jury "could have concluded that the defendant struck the victim either intending to kick him or knowing that death was virtually certain or highly probable," that is, that the State had proved purposeful or serious-bodily-injury murder. Ibid. But the jury also could have concluded that the defendant "struck the victim not knowing that serious bodily injury would result in the victim's death, or not knowing that the injury created a substantial risk of death and that it was highly probable that death would result." Jenkins, supra, 178 N.J. at 363-64, 840 A.2d 242.
Defendant here claims that the evidence clearly demonstrates that the jury could have found him guilty of aggravated or reckless manslaughter. Defendant points to his own statement to the police, where he said he had been involved in a violent struggle with Theresa at the door to their bathroom, he thought she was about to stab him, and he accidentally wrapped the telephone cord tight around her neck as he attempted to make her drop the knife. In his statement, defendant also said that he pinned the decedent's right hand against the wall to keep the knife away from him, demonstrating that she was not facing him during this part of the struggle. Defendant said he released her when she dropped the knife, but when she fell against him, he checked her pulse and realized she was dead.
Defendant contends on appeal that a jury could have found that he began choking Theresa only to prevent her from stabbing him, thus perhaps unjustifiably disregarding a substantial risk, but not intending that the pressure he applied to her neck or the length of time he applied that pressure would result in her death. Defendant contends that several facts demonstrate that a reasonable jury could have found that he acted recklessly rather than knowingly or purposely. He cites evidence (1) that Theresa was not facing him when he had the cord around the neck; (2) that her body was partially leaning against the door; and (3) that he was using only one hand to apply pressure to her neck because his other hand was pinning her arm against the wall.
Defendant also contends that police testimony as to the layout of his apartment corroborates his own statement of events: that police testified that there was a telephone located opposite a bathroom, and that the bathroom was located down the hallway from the kitchen. This testimony, defendant contends, demonstrates that Theresa could have followed him from the kitchen to the bathroom while holding a knife as he claimed, and defendant could have grabbed the telephone near the bathroom. Defendant's statement to the police, *1137 which was read to the jury, includes the following:
I didn't have any footing and she was winning at the [sic] pushing the door in. When she got the door almost all the way open, we were right there face to face and all I could see out of the corner of my left eye was the knife was right here, about two or three inches from my face. I don't know what you'd call it, like calling her bluff or something, but I said, what are you gonna do, kill me. All you're gonna do is put me out of my misery ... my intention was to get her out of the way and get out of the house. I didn't know if she would hurt me with the knife or not. The way her arm moved, it looked like the knife was coming closer to me and I believed that she was going to stab me.[4]
The State contends on appeal that there was no rational basis for a jury to find the defendant guilty of aggravated or reckless manslaughter because the medical evidence "allows for only one conclusion; that defendant intentionally murdered Theresa in a manner calculated to ensure that death would occur." The State now contends that none of the evidence supported defendant's account of the events.
The State also contends that strangulation is a crime that can be performed only with a purposeful state of mind, that is, that a homicide by strangulation cannot be aggravated or reckless manslaughter, but only murder. In support of that proposition, the State relies on State v. Bey, 129 N.J. 557, 579-80, 610 A.2d 814 (1992), cert. denied, 513 U.S. 1164, 115 S.Ct. 1131, 130 L.Ed.2d 1093 (1995), where the Court stated that "strangulation is commonly understood as a form of violence designed and likely to kill a victim, and hence would ordinarily not be used by one whose purpose was only to inflict serious bodily injury." The State also sets forth the observation in Bey that "strangulation is an especially brutal means of killing because it requires the murderer to witness the victim's gradual death throes." Id. at 580, 610 A.2d 814.
As the Court noted in Jenkins, however, it is not the role of the appellate court to judge the credibility of the evidence. See Jenkins, supra, 178 N.J. at 363, 840 A.2d 242. Without making such a judgment, a rational jury could have concluded on this record that defendant wrapped the telephone cord around Theresa's neck to make her drop the knife, thereby using the telephone cord without the intention or even conscious knowledge that death was highly probable but rather with reckless disregard of that probability or possibility. As Justice Zazzali noted in Jenkins:
The expert testimony indicating that it was not defendant's blow but rather the subsequent fall to the pavement that caused Thomas's death provides significant support for that conclusion inasmuch as the jury need not have concluded that defendant struck Thomas intending or knowing that the blow would cause him to fall down the stairs.
[Id. at 364, 840 A.2d 242].
*1138 Although the cause of death here was asphyxiation due to strangulation, and despite the testimony of Dr. Peacock, there still existed a rational basis for the jury to conclude that defendant acted recklessly rather than with purpose or knowledge. First, there was defendant's statement itself. Second, there was the testimony of defendant's ex-wife, Theresa's own sister, and a childhood friend, each of whom lived in the same household with Theresa and defendant at various times, and each of whom had witnessed Theresa initiating an argument with the defendant, even hitting or kicking him. Each witness testified that on those occasions, defendant either ignored Theresa or walked away rather than striking back. Third, the medical examiner's testimony itself allowed for the possibility that the telephone cord was wrapped just once around Theresa's neck, and that defendant did not consistently apply pressure, allowing the possibility that he did not intend to kill Theresa.
The State's contention that the "only" possible mens rea in a strangulation case is "knowing and purposeful" murder is simply inaccurate. As of 1995, when Justice Handler dissented in Bey, a significant number of strangulation homicide cases had resulted in convictions for aggravated or reckless manslaughter.
[T]his case should not be made to turn on an unenlightened discourse on strangulation, particularly among judges who know little about it ... chokinglike beatingis used commonly to overpower people without killing them ... jury verdicts and prosecutorial charging decisions suggest that New Jerseyans often believe that strangulation deaths are unintended....
Data collected by the Administrative Office of the Court and Professor David Baldus, Special Master of our Proportionality Review Project, indicate the following: of the eighty strangulation homicide cases occurring over the last decade in which strangulation was the leading cause of death and there was no doubt about the identity of the person who had committed the homicide, only forty-four resulted in convictions for knowing or purposeful or serious-bodily-injury murder. Thirty-six resulted in convictions for lesser crimes; five of those resulted in convictions for manslaughter, twenty-five for aggravated manslaughter, and eight for felony murder. See Administrative Office of the Courts, Interoffice Memo, June 3, 1992, at 2. Given those statistics, the majority's conclusion that a reasonable jury could not have found that Bey did not intend to kill is patently unsupportable.
[Bey, supra, 129 N.J. at 629-30, 610 A.2d 814 (Handler, J., dissenting)].[5]
The autopsy of the victim in Bey demonstrated that she had been beaten, stomped on the chest, sexually assaulted and strangled, the latter causing her death. Id. at 569, 610 A.2d 814. Justice Handler acknowledged the brutality of the crime but noted that there was evidence nonetheless from which the jury could have found that the killing was unintended. Id. at 631, 610 A.2d 814 (Handler, J., dissenting). "The evidence need be only `minimally adequate to provide a rational basis for the jury to find that defendant intended to cause serious bodily injury.'" Id. at 632, 610 A.2d 814 (quoting State v. Pennington, 119 N.J. 547, 561, 575 A.2d 816 (1990)).
*1139 Obviously, we are neither predicting what a new jury would do nor suggesting credibility of the witnesses. We simply conclude that this jury could have found that rather than intending Theresa's death, or knowing that her death was the likely result of his actions, defendant consciously disregarded a known risk with either a probability or possibility that death would follow from his conduct. The failure to charge the jury on aggravated and reckless manslaughter therefore had a reasonable likelihood of leading this jury to an unjust result and is therefore plain errors.

C
We next address the question whether "invited error" precludes defendant's appeal on this issue. The State contends that defendant cannot claim that the trial judge erred when defendant himself invited the "error" he now cites. Generally, a defendant cannot request the court to take a certain action, and when the outcome is unfavorable, then "[c]ondemn the very procedure he sought and urged, claiming it to be error and prejudicial." Jenkins, supra, 178 N.J. at 358, 840 A.2d 242 (citing State v. Pontery, 19 N.J. 457, 471, 117 A.2d 473 (1955)). However, the Jenkins Court determined that for this concept to apply, the party must have convinced the trial judge to accept its position, comparing the concept of invited error to the "closely related concept" of judicial estoppel in civil law. Id. at 359, 840 A.2d 242.
[W]hen there is no evidence that the court in any way relied on a defendant's position, it cannot be said that a defendant has manipulated the system. Some measure of reliance by the court is necessary for the invited-error doctrine to come into play.
[Ibid. (citing Accord Platt v. U.S., 163 F.2d 165 (10th Cir.1947))].
The Court did not find `invited error' in Jenkins because the facts demonstrated that the trial judge independently made the decision not to offer instructions on aggravated manslaughter and reckless manslaughter. There the judge stated on the record the reasons for not providing the lesser-included charges, thereby acknowledging an independent obligation to determine the appropriate jury instructions. Id. at 360, 840 A.2d 242. The Court emphasized that the trial judge stated that the evidence did not support anything other than a homicide committed "[i]n a purposeful and knowing manner." Ibid.
Here, too, the record demonstrates that before the defense took any position on the lesser-included charges, the judge had determined that murder and passion/provocation manslaughter were the only two offenses supported by the evidence, and that the evidence did not support aggravated manslaughter or reckless manslaughter. After defense counsel brought up the possible applicability of aggravated and reckless manslaughter, and after the judge gave defendant the opportunity to argue in favor of the lesser-included charges, defense counsel asked the court not to charge the jury on those offenses. The judge then followed his original intention to charge the jury only on murder and passion/provocation manslaughter. We are satisfied that the judge's decision was not solely the result of defendant's request, that defendant did not "manipulate" the judge's instruction to the jury, and that the `invited error' doctrine does not foreclose defendant's appeal on this issue.

IV
Defendant contends that the judge erred in failing to charge self-defense and to *1140 explain the concept of imperfect self-defense.

A
Defendant did not request a self-defense charge, and did not object when the judge stated that he was not going to provide instructions on self-defense. The applicable standard of review therefore is plain error. R. 2:10-2.
During the jury charge conference, the judge asked defense counsel if he wanted the jury to be instructed on self-defense. Defense counsel responded:
I would frankly tell the court my problem with this in my review of the self-defense charge, there was a portion in the charge which talks about a proportionate response to the attack and with the medical examiner's testimony, it's clear that if the victim loses consciousness after ten to fifteen seconds or thereabouts, there has to be force applied after that time period for at least some period to actually cause the irreversible injury. Because of that, legally I'm just saying I don't think I can proffer that argument.
[THE COURT]: I don't disagree but I just thought some reviewing court looking at this would want to know how come you didn't charge it and I think that is an appropriate response.
The prosecutor nonetheless argued to the jury in summation against the suggestion of a self-defense claim in defendant's statement:
[Defendant] tells [Detective Coleman] I dropped her off at the back door and she walked in and the whole nine yards. Why didn't he tell Detective Coleman well it was self-defense. Why didn't he tell Detective Coleman on January the 4th of 2001 you know I killed her but I killed her in a rage ... Then after January the 5th of 2001 when Dr. Peacock comes back with his findings that was [sic] strangulation. He gives this big story. I killed her but it was in self-defense... What percentage of the statement of January the 6th of 2001, what percentage of it is the truth. The victim missing, that she ran off with the new boyfriend. Defendant killed her, self-defense, killed her but I didn't mean it.
Defendant reminds us that his statement to the police included his contentions that he believed Theresa was going to stab him, that he strangled Theresa during a struggle over the knife, and that he let go of the telephone cord when she dropped the knife. Defendant contends that it was for the jury to determine the weight to give the State's medical testimony, and that if presented with the option, the jury could have believed his statement that he acted in self-defense.
Self-defense requires an actual, honest, reasonable belief by the defendant in the necessity of using force. Further, the force against which a defendant uses self-defense must be unlawful. Assuming there is evidence that a defendant acted in self-defense, the jury decides whether his belief was honest and reasonable. But even though the justification for a homicide is referred to as a defense, the jury need not find beyond a reasonable doubt that the defendant's belief was honest and reasonable.
[State v. Burks, 208 N.J.Super. 595, 604, 506 A.2d 779 (App.Div.1986) (citing Kelly, supra, 97 N.J. at 198-200, 478 A.2d 364)].
We have held that "the trial judge must charge the jury on self-defense `if there exists evidence in either the State's or the defendant's case sufficient to provide a `rational basis' for [its] applicability." State v. Blanks, 313 N.J.Super. 55, *1141 69-70, 712 A.2d 698 (App.Div.1998) (quoting State v. Bryant, 288 N.J.Super. 27, 35, 671 A.2d 1058 (App.Div.), certif. denied, 144 N.J. 589, 677 A.2d 761 (1996)) (emphasis added). In fact, if "any evidence raising the issue of self-defense is admitted in either the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts." Burks, supra, 208 N.J.Super. at 604, 506 A.2d 779 (citing Kelly, supra, 97 N.J. at 200, 478 A.2d 364).
The issue of self-defense was raised by defendant's statement to the police, which was read to the jury as part of the State's case. That statement, along with evidence of the victim's prior acts of aggression toward defendant, supplied a minimal basis for self-defense. There is no question of invited error on this issue; defense counsel did not ask the judge to omit the justification charge as an element the State must disprove, but merely offered the view that the evidence was not legally sufficient. Under Burks, the trial court nonetheless should have instructed the jury that the State was required, as an element of the murder charge, to prove beyond a reasonable doubt that defendant was not acting in self-defense and the judge erred in omitting such a charge.

B
Defendant also contends on appeal that the trial judge was obligated to charge the jury on an imperfect self-defense theory. Defendant concedes that he did not raise this issue at trial; thus the standard of review once again is plain error. R. 2:10-2. The State again argues invited error: that defendant made a strategic decision not to argue self-defense or seek a charge on that defense, and there was no basis for charging the jury on imperfect self-defense.
Here, in defendant's statement to the police several days after the homicide, a statement which was read to the jury at trial, defendant contended that his aggression toward Theresa was in response to her threatening him with a knife. Imperfect self-defense is "no more than an honest subjective belief on the part of the killer that his or her actions were necessary for his or her safety, even though an objective appraisal by reasonable people would have revealed not only that the actions were unnecessary, but also that the belief was unreasonable." State v. Bowens, 108 N.J. 622, 628, 532 A.2d 215 (1987).
Given our determination that defendant is to be retried, we comment on the imperfect self-defense issue here solely for guidance of counsel and the court on retrial. Imperfect self-defense is not, however, an "independent category of justification, excuse, or mitigation," but "is frequently relevant to the presence or absence of the essential elements" of a crime. Bowens, supra, 108 N.J. at 626, 532 A.2d 215; see also Pridgen, supra, 245 N.J.Super. at 246, 584 A.2d 869. The Court in Bowens expressly declined to create a separate defense or to require the State to disprove defendant's honest belief as an element of murder, because "only the Legislature may create a new category of substantive crime." Id. at 631, 532 A.2d 215 (citing N.J.S.A. 2C:1-5(a)).
In Bowens, the Court addressed two separate appeals. Each defendant had been tried separately for an unrelated crime; each contended that the jury should have been charged on imperfect self-defense. Id. at 626, 532 A.2d 215. In the trial of defendant Bowens, the jury was instructed on murder, passion/provocation manslaughter, and "justification based on self-defense." Id. at 636, 532 *1142 A.2d 215. The jury found Bowens guilty of first-degree murder. We reversed because the trial judge erred in failing to charge the jury on aggravated and reckless manslaughter. The State appealed as of right based on the dissent in this court. Ibid. The Court concluded that the trial judge "correctly denied the imperfect self-defense charge," but reversed because the jury was presented with only two choices, purposeful or knowing homicide on one hand, or acquittal on the other, when the "evidence presented an at least rational basis for convicting him of aggravated or reckless manslaughter." Id. at 640, 532 A.2d 215.
In a more detailed discussion in Bowens on the appeal of defendant Rivers, Justice Zazzali reasoned that when a trial judge includes instructions on offenses that by definition require the jury to consider whether the defendant acted knowingly or purposely, or with a less culpable, reckless state of mind, a separate instruction on imperfect self-defense is unnecessary. Id. at 637, 532 A.2d 215. The Rivers jury had been charged on murder, aggravated manslaughter, and reckless manslaughter; it found Rivers guilty of aggravated manslaughter. Id. at 635, 532 A.2d 215. Because the instructions on manslaughter informed the jury that it must consider whether Rivers acted purposely or knowingly, or only recklessly, the trial judge did not err in omitting an imperfect self-defense charge:
[I]n addition to its effect on self-defense, [d]efendant was entitled to have the jury consider the evidence of his honest, if not reasonable, belief in the necessity to use force if in fact the evidence bore upon the question whether the State had proven that he acted purposely or knowingly... The trial court gave the jury the opportunity to assess the evidence in this way when it instructed the jury on the alternate verdicts of murder, reckless manslaughter, and aggravated manslaughter, the theory the jury ultimately decided upon. In this sense, the evidence served as a `failure-of-proof defense' in addition to its service as an exculpatory defense, a defense that the jury rejected. We therefore approve the trial court's decision not to charge that imperfect self-defense would serve to reduce murder to an unspecified degree of manslaughter.
[Id. at 636-37, 532 A.2d 215 (emphasis added)].
Writing for this court in Pridgen, Judge Stern cited State v. Coyle, 119 N.J. 194, 228, 574 A.2d 951 (1990), for the proposition that when the jury in a homicide case, although not instructed on imperfect self-defense, is instructed not only on purposeful and knowing murder but also on the lesser-included offenses of aggravated or reckless manslaughter, the omission of an imperfect self-defense instruction on the murder charge is not reversible error. Pridgen, supra, 245 N.J.Super. at 248, 584 A.2d 869.
[W]hile the jury should have been instructed on the impact of an unreasonable but honest belief in the need to use force in self-defense, to the extent permitted in Bowens with respect to the murder charge, we nevertheless conclude that given defendant's conviction for aggravated manslaughter, an offense requiring only a reckless culpability, defendant suffered no harm or prejudice in this respect.
[Ibid.]
Moreover, an instruction on imperfect self-defense "should not be given with respect to the crimes of aggravated manslaughter or reckless manslaughter." Pridgen, supra, 245 N.J.Super. at 248, 584 A.2d 869.

*1143 V
In light of defendant's failure to object at trial, we also review his allegations of prosecutorial misconduct as plain error. We find no merit in those allegations respecting either the "New Years resolution" or "premeditation" comments. See R. 2:11-3(e)(2). Defendant points as well to the prosecutor's argument that prior to defendant's confession to the stabbing, he repeatedly lied about Theresa's disappearance instead of immediately claiming self-defense. In light of defendant's anticipated retrial, we simply caution the State, defense counsel, and the judge to be mindful of improper comment on a defendant's silence or omission after arrest, respecting a defense he proposes at trial. See Muhammad, supra, 182 N.J. at 558, 868 A.2d 302, and the cases discussed therein.

VI
In light of our decision that defendant is entitled to a new trial, his arguments respecting ineffective assistance of counsel, which we would otherwise preserve for a motion for post-conviction-relief, see State v. Preciose, 129 N.J. 451, 609 A.2d 1280 (1992), are moot.
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The State contends that defendant clearly had the intent to kill because "he twice wrapped a telephone cord around the victim's neck." The State contends that defendant admitted to this in his statement to the police. However, defendant never said he wrapped the cord around her neck more than once. What he said in his last statement to the police was: "[I] had the phone in my left hand and the way the wire was laying, it was coming over her shoulder and my first reaction was like I put my forearm out and tried to push her out of the bathroom so I could get out of the bathroom. . . . The way my arm was laying, I started pushing her out again, it seemed like the knife was getting closer and closer. It was just a reaction, my left hand just circled around her head and the phone cord went around her neck."
[3] Defendant did not offer expert testimony to support a battered spouse syndrome. See State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984).
[4] Incredibly, defense counsel in summation affirmatively disavowed any claim that Theresa's death was accidental. Referring to defendant's written statement to police, the attorney said:

We are not arguing that this happened by accident. He says accident in words but if you read those words in [the] context of what he is saying, what he is really saying is ["]I didn't plan for any of this to happen[,"] and that is a given.
I don't know that that could be argued against by the prosecution. There is nothing to suggest that but the actual act of strangulation is far more than just an accident. We don't differ with that testimony, that explanation by the medical examiner.
[5] In State v. Martini, 139 N.J. 3, 54, 57, 651 A.2d 949 (1994) (summarizing "similar cases" in the course of the proportionality review of the defendant's death sentence), cert. denied, 516 U.S. 875, 116 S.Ct. 203, 133 L.Ed.2d 137 (1995), Justice Clifford described two defendants accused of murder by strangulation who were permitted to plead guilty to aggravated manslaughter.